

FILED

MAR 1 4 2012

CLERK US DISTRICT COURT
NORFOLK, VA

2:11mg 140

## AFFIDAVIT IN SUPPORT OF APPLICATION
## FOR ISSUANCE OF ARREST WARRANTS

Your affiant, Brian R. Lewis, being duly sworn and deposed, states the following:

### INTRODUCTION

1.      Your affiant is a Special Agent (S/A) for Homeland Security Investigations (HSI) within the United States Department of Homeland Security, and is currently investigating a drug trafficking organization (DTO) engaged in a conspiracy to import Methylone, a Schedule I Controlled Substance, into the United States, and to distribute and possess with intent to distribute Methylone in the Eastern District of Virginia, and elsewhere.

2.      Your Affiant makes this affidavit in support of a criminal complaint and arrest warrants for: **Michael Casey BROWN**, **Archie Lee McCLENNAN**, and **Alex Lee McELHANEY.**

### CRIMINAL OFFENSES

3.      This request for a criminal complaint and arrest warrants is made in relation to the following offense occurring in the Eastern District of Virginia and elsewhere:

    a.  Conspiracy to Import a Controlled Substance, in violation of Title 21, U.S.C., §§ 963, 960, and 952.

### EXPERIENCE AND TRAINING OF AFFIANT

4.      Your affiant is a Special Agent (S/A) for Homeland Security Investigations (HSI) within the United States Department of Homeland Security, and has been so employed since May 2009. Prior to being employed with HSI, your affiant was employed as both an Immigration Enforcement Agent and as a Deportation Officer for U.S. Immigration and Customs Enforcement (ICE) for approximately four years. Prior to this employment, your affiant was a Police Officer for the Defense Logistics Agency for approximately one year. Your affiant is currently assigned to the Office of the Assistant Special Agent in Charge, Norfolk, VA as a member of the Hampton Roads Border Enforcement Security Task Force (HR-BEST), a multi-agency collaborative effort designed to identify, disrupt, and dismantle organizations that engage in transnational criminal activity with a primary focus on narcotics smuggling.  Your affiant has actively participated in undercover narcotics purchases, searches and seizures, surveillance, intelligence analysis, narcotics reversals, conspiracy investigations, arrests, interviews and interrogations, and narcotics interdiction.

5.      Based on training and experience, your affiant has become familiar with methods of operation, including the importation into the United States, storage, packaging, transportation, and distribution of narcotics by narcotics traffickers.  Your affiant is also familiar with the collection of proceeds from narcotics trafficking, and methods and schemes of money laundering used to conceal the nature of such proceeds.  Your affiant has conducted investigations regarding the unlawful importation, possession, and distribution of controlled substances, as well as related money laundering offenses involving the proceeds of specified unlawful activities and conspiracies associated with narcotics smuggling and distribution.



6.     Your affiant makes this affidavit in support of an application for arrest warrants for the following individuals: **Michael Casey BROWN, Archie Lee McCLENNAN, and Alex Lee McELHANEY**

## BASIS FOR FACTS CONTAINED IN AFFIDAVIT

7.     As this affidavit is being submitted only for the limited purpose of securing arrest warrants, your affiant has not included each and every fact known to the investigative team concerning this investigation. Rather, your affiant has set forth only those facts that are believed to be necessary to establish probable cause for issuance of the aforementioned arrest warrants. The information contained in this affidavit was derived from personal observation and from conversations with Special Agents and Detectives who were involved in this incident.

8.     Your affiant has personally participated in the investigation of the offenses described in this affidavit.  As a result of your affiant's participation in this investigation and a review of reports made to your affiant by other members of the investigative team, your affiant is familiar with the circumstances of this investigation.  On the basis of this familiarity, and on the basis of the other information which your affiant has reviewed and determined to be reliable, your affiant alleges the following:

## FACTS AND CIRCUMSTANCES

9.     On the afternoon of February 2, 2012, your affiant was contacted by detectives of the Portsmouth Police Department's Special Investigations Unit (SIU) regarding a controlled purchase of suspected 3,4-methyelenedioxymethamphetamine (MDMA), a Schedule I controlled substance, from an individual identified as Michael Casey BROWN (BROWN) earlier that day. The SIU detectives relayed information that BROWN was suspected to be importing the MDMA from an unknown source in China.  The substance purchased from BROWN field tested positive for MDMA (commonly known as Ecstasy).  Additionally, information was received that Archie Lee McCLENNAN (McCLENNAN) was in possession of, and was distributing quantities of suspected MDMA.  According to the Source of Information (SOI), large quantities of suspected MDMA are routinely delivered to McCLENNAN by BROWN.  McCLENNAN, who has multiple prior felony convictions dating back to 1972, was also witnessed to be in possession of a firearm while distributing said narcotics.

10.     Based on the previous information, Portsmouth SIU detectives secured arrest warrants for both BROWN and McCLENNAN, and search warrants for their respective residences later on the afternoon of February 2, 2012.  On the evening of February 2, 2012, Portsmouth SIU detectives, along with HSI Special Agents and other members of the HR-BEST, executed arrest warrants on BROWN and McCLENNAN and search warrants on their respective residences.

11.     During a search of McCLENNAN's residence on Sandpiper Drive in Portsmouth, Virginia, the investigative team located approximately one-half ounce of suspected MDMA, a small amount of marijuana, and three firearms.  Archie Lee McCLENNAN, Michael Casey BROWN, and Alex Lee McELHANEY (McELHANEY) were all located at this address and placed under arrest.

2



12.     Following the execution of the search warrant at McCLENNAN's residence, a second search warrant was executed at BROWN's residence on Constitution Avenue in Portsmouth. Located at this residence were thirteen firearms, approximately one kilogram of suspected MDMA, and approximately one-quarter pound of psilocybin, a Schedule I controlled substance. The suspected MDMA and the psilocybin found at BROWN's residence were located inside two safes in BROWN's bedroom. The safe containing the suspected MDMA was opened with a key provided by BROWN during his arrest at McCLENNAN's residence.

13.     After being taken to the Portsmouth Police SIU office and waiving his *Miranda* rights, BROWN provided the numerical combination to the second safe in his bedroom to members of the investigative team. Located within this second safe were the quarter-pound of psilocybin, and small amounts of other synthetic drugs, including: 5-Methoxy-N-N-dimethyltryptamine (5-MeO-DMT) 2CE, 2CI, and ZZ1. Of these drugs, only 5-MEO-DMT (Schedule I) is currently scheduled in the United States.

14.     The kilogram quantity of white crystalline powder recovered from the safe that was suspected to be MDMA field tested positive for methamphetamine/MDMA via a NarcoPouch #923 on scene.

15.     Upon waiving his *Miranda* rights, Michael Casey BROWN, a/k/a "Casey," stated that during spring 2011, he received an email address from an acquaintance for a laboratory in China that could supply him with synthetic drugs. Upon verifying the email address on various internet forums designed to assert the legitimacy of synthetic drug wholesalers, BROWN made contact with a particular vendor, later identified as Kangshuo Biotech in Suzhou City, Jiangsu Province, China.

16.     BROWN stated that he utilized his mother's computer and his own America Online (AOL) email address to make contact with "Alice" at the company, and that all of his correspondence with "Alice" was still contained within his email account. BROWN subsequently gave your affiant consent to access his email account and to change the password so as to preserve the content.

17.     BROWN went on to say that he knew that he wanted to purchase "'lone" (Methylone) from this Chinese laboratory.    3,4-Methylenedioxy-N-methylcathinone (Methylone) is a Schedule I chemical that closely mimics MDMA both in pharmacological structure and effect. Methylone was scheduled by the Drug Enforcement Administration effective October 21, 2011. Methylone is not currently scheduled under Virginia law[1].

18.     BROWN stated that his first order was in May or June 2011 for approximately 100 grams of Methylone and he paid between $300 and $400.  BROWN stated for his first order, he attempted to wire the funds to China using his own savings/checking account at a local credit union.  There were difficulties in completing this transaction according to BROWN, so he completed one wire transfer with Western Union and another with MoneyGram to settle the transaction.

---

[1] On March 13, 2012, your affiant checked § 54.1-3446 (Schedule I of the Code of Virginia) at lis.virginia.gov and confirmed that 3,4-Methylenedioxy-N-methylcathinone (Methylone) is not currently scheduled.

3



19. On subsequent orders for Methylone, of which BROWN stated that there were approximately five to six, BROWN asserted that he gave varying amounts of cash to Alex McELHANEY to place into McELHANEY's checking account at a large bank.

20. A review of BROWN's AOL email account revealed that on July 21, 2011, while Alex Lee McELHANEY was seventeen years old, BROWN contacted "Alice" and agreed to complete a wire transfer of $3000 for the purchase of 1.2 kilograms of Methylone using McELHANEY's bank account. A review of BROWN's AOL email account revealed that on August 25, 2011, while Alex Lee McELHANEY was seventeen years old[2], BROWN contacted "Alice" and agreed to complete a wire transfer of $3450 for the purchase of 1.7 kilograms of Methylone using McELHANEY's bank account. After McELHANEY deposited BROWN's money into his account, McELHANEY wired the funds to a Bank of China account using bank information provided to him by BROWN, for the purchase of Methylone. In exchange for using his account, BROWN paid McELHANEY $300 for each wire transfer McELHANEY completed.

21. BROWN stated that he used his true name on the first shipment of Methylone which was shipped to BROWN's residence, but became leery of doing so on subsequent shipments. BROWN went on to say that he made an agreement with Archie Lee McCLENNAN, a/k/a "Pops," to have the orders shipped in McCLENNAN's name to McCLENNAN's residence. When questioned as to his rationale for this decision, BROWN stated "Pops absorbs the risk if there's ever any trouble."

22. In exchange for receiving packages of Methylone in his name for BROWN, MCCLENNAN was paid $2000 per delivery by BROWN. When asked if McCLENNAN was aware what was within the packages, BROWN answered in the affirmative. He went on to say that McCLENNAN was one of his Methylone customers and that McCLENNAN would purchase between one-quarter ounce and one ounce of Methylone per week for further distribution. BROWN stated that upon delivery of the packages, McCLENNAN would contact him via telephone and let BROWN know that the package had arrived. BROWN would then travel to McCLENNAN's residence, retrieve the package and transport it to a third location, a residence BROWN shares with his wife and 3 year old child. At this location, BROWN would weigh the Methylone and begin to package it for distribution. Generally BROWN would pay McCLENNAN either the same day or the following day for accepting the package from the United States Postal Service.

23. BROWN stated that each of his last four orders were for 2.8 kilograms of Methylone. Before the orders would ship, BROWN and McELHANEY would arrange the international bank wire of $5000 through McELHANEY's bank account to "Alice's" Bank of China account for payment. When asked where BROWN acquired the funds for the most recent $5000 purchases, BROWN replied, "from hustling (selling) the 'lone."

24. BROWN stated that the typical sequence of events to place and receive an order of Methylone is as follows:

    a. BROWN makes email contact with "Alice" to confirm pricing and availability;
    b. BROWN places an order for Methylone via email to "Alice";

---

[2] McELHANEY turned 18 in August 2011 after August 25, 2011.

4



c. BROWN gets cash to McELHANEY which McELHANEY deposits into McELHANEY's bank account;

d. McELEHANY completes wire transfer to "Alice";

e. BROWN contacts "Alice" via email to ensure "Alice" has received the funds;

f. "Alice" emails BROWN the EMS Worldwide Express Mail tracking number;

g. The package is delivered within five business days to McCLENNAN's residence in the name of Archie McCLENNAN; and

h. McCLENNAN, a/k/a "Pops," calls BROWN after the package arrives.

25.    BROWN states that he distributes Methylone to individuals in the Hampton Roads Area of the Eastern District of Virginia at the following prices:

a. $30-$60 per gram;

b. $350 per ounce;

c. $1250 per quarter-pound;

d. $2000 per half-pound; and

e. $4000 per pound.

26.    Following the interview of BROWN, Archie Lee McCLENNAN, a/k/a "Pops," was interviewed. McCLENNAN waived his *Miranda* rights and agreed to be interviewed by members of the investigative team. McCLENNAN stated that packages of Methylone come to his home in heavy duty plastic-type bags labeled as "Tungsten" from China.

27.    Each time one of these packages comes to his house, McCLENNAN is paid $2000 by BROWN. McCLENNAN stated that the packages come to the United States from China through JFK International Airport in New York via the United States Postal Service.

28.    McCLENNAN went on to state that BROWN was unwilling to have the methylone packages delivered to BROWN's mother's house or BROWN's wife's house because BROWN's family members would not approve of BROWN's actions, so he (McCLENNAN) thought it would be "a great deal" (for McCLENNAN) for BROWN to arrange to have the packages delivered to McCLENNAN's residence. McCLENNAN stated, "I live on Social Security and disability" and "wasn't gonna turn no money town, especially $2000, when all I gotta do is sign my name."

29.    Although McCLENNAN indicated he knew there were drugs inside the packages, McCLENNAN indicated he never opened any of them by agreement with BROWN. McCLENNAN explained, "My job is just to sign my name on the paper" (sign for the packages). Further McCLENNAN stated, "The mailman would say "you got your letter from the lady in China again.""

30.    In addition to receiving the packages, McCLENNAN admitted that he allowed Methylone to be distributed inside his home and McCLENNAN indicated he distributed Methylone from his residence as well. McCLENNAN stated that sometimes BROWN would leave a quantity of Methylone with McCLENNAN and direct McCLENNAN to collect funds from an individual who would later arrive to retrieve it. McCLENNAN further stated that BROWN trusted him because McCLENNAN "don't use the stuff, I just smoke pot." McCLENNAN added, "I told him (BROWN) don't leave no weed around me because I'll smoke it up, but I don't mess with this stuff, I got a bad heart." McCLENNAN stated that he most

recently purchased seven grams of Methylone from BROWN on February 1, 2012, the day prior to the execution of the search warrants.

31.     McCLENNAN then went on to state that BROWN was one of two "guys within 500 miles of here who've got this stuff." According to McCLENNAN, "The other guy is supposedly in Northern Virginia somewhere." When pressed for further details, McCLENNAN explained that BROWN has a monopoly on the local Methylone market because, "nobody else can get the stuff from China." McCLENNAN stated that he received between three and five packages of Methylone for BROWN. When asked if he thought it was illegal, McCLENNAN stated that BROWN told him "it's gonna be scheduled soon, so I'm gonna double it" referring to the price. McCLENNAN then asserted that both he and BROWN knew what they were doing was illegal. McCLENNAN said that BROWN told him that it was "synthetic ecstasy, like molly."

32.     When McCLENNAN was asked about the three firearms recovered from his residence during the search warrant, he replied that only one of the firearms was his (a .32 caliber revolver recovered from a back room). McCLENNAN stated that he bought the .32 revolver for $100 in the Craddock section of Portsmouth between two and two-and-one-half months ago. When agents reminded McCLENNAN that he is a convicted felon and prohibited from possessing a firearm, he stated, "I know, I know."

33.     The final interview was of Alex Lee McELHANEY, the grandson of McCLENNAN. McELHANEY also waived his *Miranda* rights and agreed to be interviewed by members of the investigative team. McELHANEY stated that McCLENNAN, a/k/a "Pops," would give McELHANEY large sums of cash to deposit into McELHANEY's bank account with directions on who to send the money to in China. According to McELHANEY, this occurred between four and five times with amounts ranging between $3000 and $5000, and that McELHANEY is paid $300 by McCLENNAN on each occasion for using his bank account. McELHANEY stated that the "'lone" (Methylone) arrives from China to McCLENNAN's house in a heavy grey plastic bag with McCLENNAN's name on it. McELHANEY stated that when the package arrives, McCLENNAN would call BROWN to retrieve the package. McELHANEY further stated that BROWN gives McCLENNAN money to put McCLENNAN's name on the packages, and that they all knew "the whole thing was illegal."

34.     McELHANEY was confronted with bank receipts recovered from his wallet and acknowledged that all of these receipts were related to the Methylone importation and distribution conspiracy. Additionally, a handwritten note containing wire transfer information for a Bank of China account was recovered from McELHANEY's wallet. McELHANEY also acknowledged that this note was related to the Methylone and that the information on the paper referred to the account into which he would wire the money in China. McELHANEY stated that McCLENNAN buys Methylone from BROWN every week and sells it to various people who come to McCLENNAN's residence.

35.     When asked how the Methylone arrives to the United States from China, McELHANEY stated that BROWN sends an email to China. McCLENNAN and BROWN then give money to McELHANEY to wire to China and the Methylone subsequently arrives at McCLENNAN's residence for packaging and distribution. McELHANEY stated, "I got a kid on the way, so I took the chance to make some money." McELHANEY stated that on two occasions, he purchased between two and three grams of Methylone from BROWN which he distributed.



36.    When McELHANEY was confronted with the firearm recovered from underneath his mattress (at McCLENNAN's residence), he initially denied possessing it, then stated that McCLENNAN told him to place it under his mattress because McCLENNAN already had two other firearms in the living room.  McELHANEY admitted to having placed one of the firearms in his vehicle and to having driven McCLENNAN around to buy marijuana and to sell Methylone to/from various individuals in the city of Portsmouth.  McELHANEY stated that McCLENNAN was in possession of a firearm on every occasion that they would travel to purchase marijuana and/or distribute Methylone.

37.    A review of BROWN's AOL email account revealed that between June 24, 2011 and January 9, 2012, BROWN imported 14.7 kilograms (or 147,000 individual doses assuming a per dose average of 100mg) of Methylone.  Methylone became a Schedule I controlled substance on October 21, 2011.  Since that date, BROWN has imported a total of 8 kilograms, or 80,000 individual doses.

## CONCLUSION

38.    Based on the foregoing, your affiant submits that there is probable cause to believe that **Michael Casey BROWN, Archie Lee McCLENNAN** and **Alex Lee McELHANEY** did unlawfully, knowingly and intentionally combine, conspire, confederate and agree to import 3,4-Methylenedioxy-N-methylcathinone (Methylone), a Schedule I controlled substance, into the United States from China, a place outside the United States, in violation of Title 21, United States Code, Sections 963, 960, and 952.

FURTHER YOUR AFFIANT SAYETH NOT.

Brian R. Lewis
Special Agent
Homeland Security Investigations

Reviewed:

Darryl J. Mitchell
Assistant United States Attorney

Sworn and subscribed to before me
On this \_14__ day of March 2012

United States Magistrate Judge
Norfolk, Virginia

7